# United States Tax Court

T.C. Memo. 2025-73

ROCK CLIFF RESERVE, LLC, FIVE RIVERS CONSERVATION
GROUP, LLC, TAX MATTERS PARTNER, ET AL.,[1]
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

―――――――

Docket Nos. 12472-20, 12482-20,      Filed July 14, 2025.
12483-20, 13758-20.

―――――――

*Michelle A. Levin*, *Gregory P. Rhodes*, *Sarah E. Green*, *Ronald A. Levitt*, *Kristin Martin Centeno*, *Sarah L. Ray*, *Logan C. Abernathy*, and *Emily C. Ellis*, for petitioner.

*Justin D. Scheid*, *Daniel S. Emas*, *Ashley M. Van Fleet*, *Marcus M. Clinkscales*, and *Rishi K. Jain*, for respondent.

## TABLE OF CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION ...................... 4

FINDINGS OF FACT ............................................................... 6

I.    Properties................................................................... 6

     A.    Rock Cliff Property.................................................. 7

―――――――

[1] The following cases are consolidated herewith: Jack's Creek Reserve, LLC, Five Rivers Conservation Group, LLC, Tax Matters Partner, Docket No. 12482-20; East Village Reserve, LLC, Five Rivers Conservation Group, LLC, Tax Matters Partner, Docket No. 12483-20; and Baker's Farm Nature Reserve, LLC, Five Rivers Conservation Group, LLC, Tax Matters Partner, Docket No. 13758-20.

**[\*2]** B.     The JEB Properties ........................................................ 7

II.    Land Acquisition Transactions ........................................ 8

     A.    Rock Cliff ............................................................ 8

     B.    JEB Properties .................................................. 10

     C.    InvestCos Buy In .............................................. 13

         1.    Rock Cliff PropertyCo ..................................... 13

         2.    Jack's Creek PropertyCo ................................... 14

         3.    East Village PropertyCo .................................... 15

         4.    Baker's Farm PropertyCo ................................. 15

III. Granting the Easements ................................................ 16

IV. Trial ............................................................................. 16

     A.    Respondent's Experts ........................................ 16

         1.    Leslie Sellers ................................................... 16

         2.    Michael Chamberlain ...................................... 17

     B.    Petitioner's Experts .......................................... 18

         1.    Thomas Spears ............................................... 18

         2.    Belinda Sward ................................................ 19

         3.    Stephen Rakestraw .......................................... 19

         4.    David Ferrell ................................................... 20

V.    Tax Return and IRS Examination ................................. 20

OPINION ............................................................................ 21

I.    Burden of Proof ........................................................ 22

II.    Qualified Appraiser .................................................... 23

[*3]

III. Valuation ................................................................ 29

    A.    "Before" Value of Rock Cliff Property ................................. 32

        1.    Highest and Best Use ...................................................... 32

        2.    Sales Comparison Valuation ........................................ 33

        3.    Actual Transactions Involving Rock Cliff PropertyCo ................................................................ 37

    B.    "Before" Value of Jack's Creek PropertyCo ........................... 38

        1.    Highest and Best Use ...................................................... 38

        2.    Sales Comparison Valuation ........................................ 38

        3.    Actual Transaction Involving Jack's Creek PropertyCo ................................................................ 40

    C.    "Before" Value of East Village PropertyCo .......................... 41

        1.    Highest and Best Use ...................................................... 41

        2.    Sales Comparison Valuation ........................................ 42

        3.    Actual Transactions Involving East Village PropertyCo ................................................................ 44

    D.    "Before" Value of Baker's Farm PropertyCo ........................ 45

        1.    Highest and Best Use ...................................................... 45

        2.    Sales Comparison Valuation ........................................ 45

        3.    Actual Transactions Involving Baker's Farm PropertyCo ................................................................ 49

    E.    "After" Values and Conservation Easement Values ............. 50

IV. Other Deductions ...................................................... 51

V. Section 6662 Accuracy-Related Penalties ..................... 51

    A.    40% Penalty for Gross Valuation Misstatements ................. 53

[*4] B.    20% Penalty as to Substantial Understatements.................. 53

VI.  Conclusion.................................................................................. 55

MEMORANDUM FINDINGS OF FACT AND OPINION

NEGA, *Judge*: These consolidated cases involve charitable contribution deductions claimed for conservation easements in Walton County, Georgia.   The partnerships that donated the conservation easements claimed aggregate charitable contribution deductions under section 170[2] in excess of $62 million.

The partnerships in these consolidated cases are Rock Cliff Reserve, LLC (Rock Cliff PropertyCo), Jack's Creek Reserve, LLC (Jack's Creek PropertyCo), East Village Reserve, LLC (East Village PropertyCo), and Baker's Farm Nature Reserve, LLC (Baker's Farm PropertyCo).

Five Rivers Conservation Group, LLC (Five Rivers), is the tax matters partner for each of the partnerships in these cases.   The Internal Revenue Service (IRS) adjusted the charitable contribution deductions as follows for tax year 2015 on the Notice of Final Partnership Administrative Adjustment (FPAA) issued to each partnership:

| *Partnership* | *Total Charitable Contribution Claimed* | *Total Charitable Contribution Allowed by the FPAA* |
|---|---|---|
| Rock Cliff PropertyCo | $14,665,625 | $25,625 |
| Jack's Creek PropertyCo | 19,005,000 | 5,000 |
| East Village PropertyCo | 16,028,333 | 28,333 |
| Baker's Farm PropertyCo | 13,005,000 | 5,000 |

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*5]** The IRS also adjusted the "Other Deductions" claimed by the partnerships as impermissible expenses for "amounts paid or incurred to organize a partnership or promote the sale of an interest in a partnership." From the FPAAs, these disallowances were as follows:

| Partnership | Total "Other Deductions" Claimed | Total "Other Deductions" Allowed by the FPAA |
|---|---|---|
| Rock Cliff PropertyCo | $2,046,255 | $16,594 |
| Jack's Creek PropertyCo | 2,103,623 | 16,427 |
| East Village PropertyCo | 1,515,713 | 7,641 |
| Baker's Farm PropertyCo | 998,598 | 16,208 |

We tried these cases in Atlanta, Georgia, on October 30 through November 6, 2023. The questions to decide are (1) whether the noncash charitable contribution deductions should be disallowed in their entirety because the partnerships failed to attach to their returns "qualified appraisal[s]" as required by section 170(f)(11)(D); (2) whether the partnerships are entitled to the "other deductions" claimed on their respective returns; and (3) whether each partnership is subject to a 40% penalty for a gross valuation misstatement under section 6662(h) or, in the alternative, subject to a 20% penalty under other provisions of section 6662(a).

We hold that the partnerships are entitled to noncash charitable contribution deductions of zero for 2015, because they failed to secure and attach to their returns "qualified appraisal[s]" of the contributed property. *See* § 170(f)(11)(D). Additionally, we hold that the partnerships are not entitled to any "other deductions" in excess of those allowed in the FPAA.

With regard to penalties, we find that the values claimed on the partnerships' returns each exceeded the fair market values (FMV) of the easements by more than 200%, and the partnerships are therefore liable for the 40% gross valuation misstatement penalty. *See* § 6662(a), (h). Finally, we hold that each partnership is liable for a 20% penalty on the portion of the underpayment not attributable to the valuation

**[\*6]** misstatement by reason of a substantial understatement of income tax and negligence.

## FINDINGS OF FACT

The following facts are derived from the pleadings, Stipulations of Facts with attached Exhibits, numerous trial Exhibits, and the testimony of fact and expert witnesses admitted into evidence at trial. The four partnerships—Rock Cliff PropertyCo, Jack's Creek PropertyCo, East Village PropertyCo, and Baker's Farm PropertyCo (collectively, PropertyCos)—are Georgia limited liability companies (LLCs) classified as TEFRA partnerships at all relevant times.[3] Five Rivers, the petitioner in each case, is the tax matters partner of each partnership. All five entities had their principal places of business in Georgia when the Petitions were timely filed.

Some of petitioner's fact witnesses were important participants in the "syndicated conservation easement space," including the promoters[4] who organized the transactions and helped market the deals to investors. Other witnesses had invested in easement deals or acted as professional advisers to the promoters. Many of these witnesses had a direct or indirect stake in the outcome of these cases. While generally showing good recall of many facts from almost ten years ago, the witnesses sometimes expressed inability to recall certain facts about matters that might be regarded as unhelpful to petitioner's position. Because of these witnesses' interest in the outcome and selective inability to recall pertinent facts, the Court has been required to make credibility determinations.

## I. *Properties*

The properties in these consolidated cases are all in Walton County, Georgia. Walton County is a rural county approximately 30 miles east of metro Atlanta at its nearest point. In the 2010 census the population of Walton County was 83,768, up from 61,413 in 2000.

---

[3] Before its repeal, TEFRA, the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, governed the tax treatment and audit procedures for many partnerships.

[4] In this Opinion we use the term "promoter" in its ordinary sense, making no determination as to whether any such person is subject to the civil penalty under section 6700(a) for "promoting abusive tax shelters."

**[*7]**   A.   *Rock Cliff Property*

The Rock Cliff Property is approximately 184 acres of vacant, unimproved land located in the Town of Between in Walton County. The Town of Between is 42 miles east of Atlanta and had a population of approximately 384 as of the 2010 census. At trial the mayor of the Town of Between testified that it took him an hour and 20 minutes to reach the downtown Atlanta courthouse from his residence in the Town of Between.

Before 2005 Martin Marietta Materials, Inc. (Martin Materials), owned the Rock Cliff Property.

On June 23, 2005, Martin Materials transferred two tracts of land to Christian MM, LLLP (Christian MM), a limited liability limited partnership with George Baker, Jr. (Mr. Baker Jr.), Wayne F. Christian, Don Christian, and George Baker III (Mr. Baker III) as members. Tract One (Rock Cliff Property) totaled 184.221 acres and Tract Two totaled 87.400 acres, for a total of approximately 271 acres.

Immediately after the original acquisition in 2005, Christian MM sold Tract Two to a residential developer.

On June 9, 2008, Christian MM entered into a Commercial Deed to Secure Debt and Security Agreement with Liberty First Bank for $915,000. The debt was secured by the entire 184.221 acres of the Rock Cliff Property.

Around 2011 Mr. Baker Jr. and Mr. Baker III (collectively, Bakers), began marketing the Rock Cliff Property as a potential mixed-use development, offering it at $1,150,000 for all 184 acres. They were unsuccessful in finding a buyer.

B.   *The JEB Properties*

The JEB Properties—consisting of the Jack's Creek Property, the East Village Property, and the Baker's Farm Property—are parts of a contiguous tract of land located in Monroe, Georgia, in Walton County. The JEB Properties are located more than 40 miles from downtown Atlanta. Together, the properties total almost 248 acres. The entire tract was originally a dairy farm owned by the Baker family.

**[*8]**    The Jack's Creek Property is 128.6 acres, with 17.79 acres subject to a preexisting conservation easement.  The Jack's Creek Property was owned entirely by George W. Baker Jr. LLC.

The East Village Property is 54.89 acres of which 11.47 acres were subject to a preexisting conservation easement.  The East Village Property was owned by Monroe Walton Properties LLC (Monroe Walton), Baker Walton JV LLC (Baker Walton), Henry Phillip Richardson, and James Donald Richardson.

The Baker's Farm Property is 64 acres.  It was owned by Monroe Walton and Baker Walton.

Mr. Baker Jr. was the managing member of Monroe Walton, Baker Walton, and George W. Baker Jr. LLC.

II.    *Land Acquisition Transactions*

Todd Collins formed Five Rivers in 2011 and has been the managing partner ever since.  He owned a 50% interest in Five Rivers at all relevant times.  Mr. Collins has completed approximately 24 or 25 conservation easement transactions—completing 6 such transactions in 2015.

Five Rivers organized the transactions underlying the charitable contribution deductions at issue in these cases.  Five Rivers negotiated the acquisition of land on behalf of the PropertyCos and marketed the transactions to investors who would ultimately claim most of the charitable contribution deductions from the donations of conservation easements on the acquired land.

A.    *Rock Cliff*

Mr. Collins first became interested in the Rock Cliff Property when Mr. Baker Jr. contacted Mr. Collins in an effort to sell the Rock Cliff Property in early 2015.

Mr. Baker Jr. and Mr. Collins agreed that Christian MM would be paid $1.1 million for the Rock Cliff Property.  Mr. Collins testified that he found Mr. Baker Jr. to be a fair negotiator in the discussions leading up to this agreement.

On March 31, 2015, Mr. Collins sent Mr. Baker Jr. a letter of intent regarding the Rock Cliff Property (Rock Cliff Letter of Intent),

[*9] describing the proposed transaction and memorializing the proposed purchase price of $1.1 million. The cash for the proposed transaction would come from outside investors who would participate through a partnership called Rock Cliff Reserve Investment Partners, LLC (Rock Cliff InvestCo).

The Rock Cliff Letter of Intent described a transaction where Christian MM would contribute the Rock Cliff Property to Rock Cliff PropertyCo in exchange for a 98% interest in Rock Cliff PropertyCo and Five Rivers would contribute cash for a 2% interest in Rock Cliff PropertyCo. Next, Christian MM would sell 96% of Rock Cliff PropertyCo to Rock Cliff InvestCo for $1.1 million and retain a 2% interest in Rock Cliff PropertyCo.

On June 16, 2015, Christian MM and Five Rivers entered into a Management Agreement that required the written consent of Christian MM for any action taken related to the Rock Cliff Property.

On April 30, 2015, Mr. Collins emailed Ronald Foster, the appraiser who ultimately prepared appraisals for the partnerships' 2015 returns, stating that Rock Cliff PropertyCo wanted to engage Mr. Foster to prepare a preliminary and a final conservation easement appraisal for the Rock Cliff Property.

According to the Rock Cliff Letter of Intent, Christian MM would receive a pro rata share of the potential charitable contribution deduction, equal to its 2% interest at the time of the planned easement donation. The estimated pro rata share of the deduction for Christian MM was $288,288, which means that the Rock Cliff Letter of Intent was based on the future conservation easement's having an estimated value of $14,414,400.[5]

Mr. Collins testified that the $14,414,400 estimate was provided by Mr. Foster. However, the March 31, 2015, Rock Cliff Letter of Intent was developed at least a month before the April 30, 2015, email from Mr. Collins to Mr. Foster providing basic information about the Rock Cliff Property and engaging Mr. Foster's services.

On May 11, 2015, Rock Cliff PropertyCo was organized as a Georgia LLC. No capital contributions were made on or about May 11, 2015, by any member.

---

[5] Two percent of $14,414,400 is $288,288.

**[\*10]** In June 2015[6] Rock Cliff PropertyCo entered into a Membership Unit Purchase Agreement (MUPA) with Rock Cliff InvestCo and Christian MM. The MUPA described the same transaction as the Letter of Intent; Christian MM would transfer its interest in the Rock Cliff Property to Rock Cliff PropertyCo in exchange for a 98% interest and would then sell a 96% interest to Rock Cliff InvestCo. The remaining 2% interest in Rock Cliff PropertyCo would be held by Five Rivers.

Christian MM contributed the Rock Cliff Property to Rock Cliff PropertyCo by deed recorded on November 4, 2015.[7] When Christian MM sold 96% of its interest in Rock Cliff PropertyCo, it reported the proceeds as long-term capital gain from the sale of land. The record makes it clear that the Bakers intended to sell the properties at issue to Mr. Collins; in fact at trial, George Baker III testified that a "sale of land" was consistent with his understanding of the transactions involved.

B. *JEB Properties*

After the negotiations for the Rock Cliff Property had resulted in a Letter of Intent, Mr. Baker Jr. began to negotiate the sale of the JEB Properties. On April 9, 2015, Mr. Baker Jr. wrote to Mr. Collins that the asking price for the JEB Properties was $19,500 per acre or $4,921,800.

After some negotiations the parties came to an agreement, and on July 27, 2015, Mr. Baker III sent Mr. Collins a breakdown of the agreed purchase prices of the JEB Properties by tract, totaling $4,650,000.

On April 29, 2015, while in the midst of negotiating the purchase of the JEB Properties, Mr. Collins sent an email to a third-party land broker in which Mr. Collins estimated the FMV of the JEB Properties to be $42,192,000. This estimate appears to have been arrived at before Mr. Foster ever saw the JEB Properties, because Mr. Foster emailed Mr.

---

[6] The specific date is blank.

[7] As late as November 2, 2015, there was no date on the deed transferring the Rock Cliff Property to Rock Cliff PropertyCo. On that date Mr. Baker III emailed Andrew Garner (a lawyer assisting with the closing of the transaction) asking what date should go on the deed. Ultimately, the date written on the deed was September 16, 2015. This date has little significance, because under Georgia law a transfer is not valid until the deed is delivered to the grantee. *Giuffrida v. Knight*, 78 S.E.2d 29, 30 (Ga. 1953).

**[\*11]** Collins on May 13, 2015, requesting the address of the JEB Properties.[8]

Similar to the Rock Cliff transaction, Five Rivers and the owners of the JEB Properties (JEB Landowners, including the owners of the Jack's Creek Property, the owners of the East Village Property, and the owners of the Baker's Farm Property) executed Letters of Intent (Jack's Creek Letter of Intent, East Village Letter of Intent, and Baker's Farm Letter of Intent) for the JEB Properties that each described the transactions and agreed to purchase prices to be paid to the respective JEB Landowners by investment partnerships (InvestCos) formed for the respective transactions.[9] The prices in the July 27, 2015, price breakdown match exactly the purchase prices in the Letters of Intent for the respective JEB Properties.

The Letters of Intent for the JEB Properties were signed by all parties on or about August 24, 2015.

In addition to many terms similar to those in the Rock Cliff Letter of Intent, the Letter of Intent for each of the JEB Properties contained a "preclosing control" provision. These provisions functioned in much the same way as the Management Agreement entered into between Christian MM and Five Rivers on June 16, 2015. The preclosing control provision from the Baker's Farm Letter of Intent states:

> After Owners form [Baker's Farm PropertyCo] and transfer the Property to [Baker's Farm PropertyCo], prior to the closing of the sale of a 98% interest in [Baker's Farm PropertyCo] to Baker's Farm [InvestCo] . . . Owners shall serve as the Managing Member of [Baker's Farm PropertyCo] and shall control all decisions and actions of [Baker's Farm PropertyCo] until the closing of such sale.

---

[8] The total "before" value that Mr. Foster appraised the JEB Properties at in November 2015 was $48.47 million or 115% of the estimate that Mr. Collins used in the April 29 email. *See infra* pp. 27–28.

[9] The InvestCos include Jack's Creek Reserve Investment Partners, LLC (Jack's Creek InvestCo), East Village Reserve Investment Partners, LLC (East Village InvestCo), Baker's Farm Nature Reserve Investment Partners, LLC (Baker's Farm InvestCo), and Rock Cliff InvestCo.

[*12] The Letters of Intent for the Jack's Creek Property and the East Village Property each contain substantially identical "preclosing control" provisions.

Mr. Baker Jr. negotiated the preclosing control provisions to protect the interests of his family, Christian MM, and the JEB Landowners.

The Jack's Creek Letter of Intent stated that the owners of the Jack's Creek Property would be paid $1,991,225 and estimated that the conservation easement to be granted on the property would be worth $18,303,300.[10]

The East Village Letter of Intent stated that the owners of the East Village Property would be paid $875,373 and estimated that a conservation easement on the property would be worth $15,342,800.[11]

The Baker's Farm Letter of Intent stated that the owners of the Baker's Farm Property would be paid $1,783,402 and estimated that a conservation easement on the property would be worth $12,526,800.[12]

The Letters of Intent for the JEB Properties each specify that Five Rivers' capital contribution to each PropertyCo would be "cash in an amount equal to 1.01% of the agreed upon value of" the property contributed. Five Rivers never made the agreed capital contributions.

Additionally, the Letters of Intent for the JEB Properties each stated that the respective JEB Landowners would be paid $50,000 earnest money. This earnest money was paid on August 25, 2015.

On September 8 and 9, 2015, the JEB PropertyCos entered into binding MUPAs with the respective InvestCos and JEB Landowners. The MUPAs described the same transaction as the Letters of Intent: The

---

[10] The Jack's Creek Letter of Intent estimated that 1% of the charitable contribution deduction would be approximately $183,033. Mr. Foster ultimately appraised the Jack's Creek conservation easement at $19 million.

[11] The East Village Letter of Intent estimated that 1% of the charitable contribution deduction would be $153,428. Mr. Foster ultimately appraised the East Village conservation easement at $16 million.

[12] The Baker's Farm Letter of Intent estimated that 1% of the charitable contribution deduction would be $125,268. Mr. Foster ultimately appraised the Jack's Creek conservation easement at $13 million.

[*13] InvestCos would purchase the large majority of the JEB Landowners' interests in the PropertyCos.

Monroe Walton reported the proceeds it received in the Baker's Farm and East Village transactions as money received for "Land" on Schedule D, Capital Gains and Losses, of its 2015 Form 1065, U.S. Return of Partnership Income. George W. Baker, Jr. LLC described the property sold as "Jack's Creek Reserve" on its Form 8949, Sales and Other Dispositions of Capital Assets, for 2015.[13]

C.    *InvestCos Buy In*

Mr. Collins was responsible for finding outside investors for all four of these transactions.

In marketing the transactions, Mr. Collins advertised an estimated ratio of charitable contribution deduction to investor cost. Mr. Collins insisted that the ratio not exceed 4.58 to 1. That ratio yields approximately a $2 posttax benefit to investors for every $1 invested. The actual ratio in each of these transactions was advertised as 4.4 to 1 (i.e. $4.40 of charitable contribution deduction for every $1 invested).

Mr. Collins found most investors through referrals from accountants and financial advisors. These investors purchased interests in the InvestCos, and on November 5, 2015, the InvestCos each wired money to Five Rivers in order to buy into the PropertyCos as follows.

1.    *Rock Cliff PropertyCo*

On November 4, 2015, Christian MM recorded a quitclaim deed transferring the Rock Cliff Property to Rock Cliff PropertyCo.

On November 5, 2015, Rock Cliff InvestCo paid $2,486,300 to Five Rivers, which in turn paid $1.1 million to Christian MM.[14]

---

[13] The reporting positions of the other contributing partners are not clear from the record.

[14] The $2.486 million payment is difficult to reconcile with petitioner's proposed form of the transaction. If the InvestCos bought interests in the PropertyCos directly from Christian MM, it cannot be that the InvestCos paid $2.486 million and Christian MM received only $1.1 million. Petitioner accounts for this difference with management fees imposed by Five Rivers as well as various payments made to the respective PropertyCos for legal fees, administrative fees, and accounting fees.

**[*14]** On or after November 6, Christian MM used the money received in the transaction to pay off the loan encumbering the Rock Cliff Property.

Before the November closing, Rock Cliff PropertyCo had 100 shares: Christian MM held 98 shares and Five Rivers held 2 shares. Five Rivers did not contribute any capital in exchange for its shares in Rock Cliff PropertyCo and did not report the receipt of shares as income received in exchange for services.[15]

After the completion of the transactions, Rock Cliff PropertyCo had 100 total shares: Rock Cliff InvestCo held 96 shares, Five Rivers held 2 shares, and Christian MM held 2 shares.

### 2. *Jack's Creek PropertyCo*

On November 4, 2015, George W. Baker Jr. LLC recorded a limited warranty deed transferring the Jack's Creek Property to Jack's Creek PropertyCo.

On November 5, 2015, Jack's Creek InvestCo paid $4.035 million to Five Rivers, who in turn paid $1,991,225 to George W. Baker Jr. LLC.

Before these transactions, Jack's Creek PropertyCo had 100 total shares: George W. Baker Jr. LLC held 99 shares and Five Rivers had 1 share. Five Rivers did not contribute any capital in exchange for its share in Jack's Creek PropertyCo and did not report the receipt of its share as income received in exchange for services.

After the completion of the planned transactions, Jack's Creek PropertyCo still had 100 total shares: Jack's Creek InvestCo held 98 shares, Five Rivers held 1 share, and George W. Baker Jr. LLC held 1 share.

---

Petitioner fails to identify any capital account adjustment for this extra money paid to the PropertyCos by the InvestCos.

[15] Petitioner claims that Mr. Collins contributed his services on behalf of Five Rivers in exchange for the partnership interest that Five Rivers received. Capital partnership interests (as opposed to profits interests) received in exchange for services are ordinary income to the recipient. *See Diamond v. Commissioner*, 56 T.C. 530, 544–45 (1971), *aff'd*, 492 F.2d 286 (7th Cir. 1974). This income is outside the scope of this TEFRA proceeding because it is not a partnership item. *See* §§ 6221, 6226; *see also United States v. Woods*, 571 U.S. 31, 39–42 (2013).

15

**[*15]**      3.      *East Village PropertyCo*

On November 4, 2015, Baker Walton, Henry Phillip Richardson, James Donald Richardson, and Monroe Walton (collectively, East Village Landowners) recorded several limited warranty deeds transferring their entire interests in the East Village Property to East Village PropertyCo.

On November 5, 2015, East Village InvestCo paid $3,122,845 to Five Rivers, which in turn paid $875,373 to the East Village Landowners.

Before the November closing of the transactions, East Village PropertyCo had 100 total shares: The East Village Landowners owned a total of 99 shares[16] and Five Rivers held 1 share. Five Rivers did not contribute any capital in exchange for its share in East Village PropertyCo and did not report the receipt of its share as income received in exchange for services.

After November 6, 2015, East Village PropertyCo still had 100 total shares: East Village InvestCo held 98 shares, Five Rivers held 1 share, and the East Village Landowners each held 0.25 shares in East Village PropertyCo.

4.      *Baker's Farm PropertyCo*

On November 4, 2015, Baker Walton and Monroe Walton (Baker's Farm Landowners) recorded separate limited warranty deeds transferring their entire interests in the Baker's Farm Property to Baker's Farm PropertyCo.

On November 5, 2015, Rock Cliff InvestCo paid $2,745,750 to Five Rivers, which in turn paid $1,783,402 to the Baker's Farm Landowners.

Before these transactions, Baker's Farm PropertyCo had 100 total shares: Baker Walton owned 33.11 shares, Monroe Walton owned 65.89 shares, and Five Rivers held 1 share. Five Rivers did not contribute any capital in exchange for its share in Baker's Farm

---

[16] Baker Walton owned 45.12 shares, Henry Phillip Richardson owned 17.96 shares, James Donald Richardson owned 17.96 shares, and Monroe Walton owned 17.96 shares.

[*16] PropertyCo and did not report the receipt of its share as income received in exchange for services.

After the completion of the planned transactions, Baker's Farm PropertyCo still held 100 total shares: Baker's Farm InvestCo held 98 shares, Five Rivers held 1 share, Monroe Walton held 0.67 share and Baker Walton held 0.33 share.

### III. *Granting the Easements*

Dr. Robert Keller, Chief Executive Officer of the Atlantic Coast Conservancy, Inc. (ACC), drafted the conservation easement deeds for all four of the transactions involving the Rock Cliff Property, the Baker's Farm Property, the East Village Property, and the Jack's Creek Property (collectively, Properties).

The members of the InvestCos voted on whether they wanted a conservation easement on the Properties to be donated to charity or preferred that the Properties be held for sale, development, or investment. All parties knew that this vote was a foregone conclusion intended to mask the pre-planned nature of the transaction. At trial Mr. Collins testified that no group of investors had ever chosen anything other than the conservation easement option in any of the transactions involving him. Mr. Collins described the investor vote as a formality inserted by lawyers to make the transaction "be compliant with the Tax Code." As expected, all members voted to donate a conservation easement.[17] On November 13, 2015, the PropertyCos each donated conservation easements on the Properties to the ACC.

### IV. *Trial*

#### A. *Respondent's Experts*

##### 1. *Leslie Sellers*

Leslie Sellers, respondent's appraisal expert, has decades of experience in real estate appraisal, having been an independent real estate valuation consultant since 1976. Mr. Sellers earned a B.S. in real estate and urban development from the University of Tennessee. Mr. Sellers was previously the national president of the Appraisal Institute.

---

[17] All members knew the vote was a foregone conclusion; the voting mechanic was included to defend against the impression that all parties may have intended from the outset to place an overvalued conservation easement on the Properties.

[*17] He is currently a designated Member of the Appraisal Institute (MAI) and a member of the instructor faculty for the Appraisal Institute, where he teaches basic and advanced real estate valuation classes.

Mr. Sellers is a co-author of some prominent texts in the field of real estate appraisal, including recent editions of *The Appraisal of Real Estate* and *The Dictionary of Real Estate Appraisal*. Petitioner's appraiser, Thomas Spears, referenced and relied on both *The Appraisal of Real Estate* and *The Dictionary of Real Estate Appraisal* in preparing his reports.

We recognized Mr. Sellers as an expert in the field of real estate appraisal. We found his testimony credible for both his initial appraisals and his rebuttal reports.

2.  *Michael Chamberlain*

Michael Chamberlain is a professor of wildlife ecology and management at the University of Georgia. Respondent called Dr. Chamberlain to testify about the conservation purposes of the Rock Cliff easement as well as the reserved rights allowed by the conservation easement.

We recognized Dr. Chamberlain as an expert in the field of wildlife ecology. We found his testimony credible.

Dr. Chamberlain observed the Rock Cliff Property in great detail, noting the significant value that its natural features had as habitats for wildlife—particularly the granite outcrops and streams on the property.

Dr. Chamberlain represented that the reserved rights in the Rock Cliff conservation easement would allow livestock grazing, fence construction, crop production, and the installation of permanent structures to support such agricultural activities. He based this understanding on his personal reading of the deed of conservation easement and he focused on the possible exercise of the reserved rights but did not devote attention to the probability or financial feasibility of the reserved rights' being exercised.

Dr. Chamberlain concluded that the reserved rights would "greatly undermine the ecological importance" of the protected areas if the reserved rights were exercised.

[*18] B.    *Petitioner's Experts*

    1.    *Thomas Spears*

Thomas Spears, petitioner's appraisal expert, is an Accredited Senior Appraiser and a Professional Chartered Surveyor Member of the Royal Institution of Chartered Surveyors. Mr. Spears is not a designated MAI. To receive the Appraisal Institute's MAI designation, an applicant must pass the Appraisal Institute's comprehensive exam, a two-day, four-part exam. Mr. Spears took the Appraisal Institute's comprehensive exam twice and failed both times.

We recognized Mr. Spears as an expert in the field of real estate appraisal. We did not find his testimony credible.

In 2021 Mr. Spears was a plaintiff and putative class representative in *Benson v. IRS* (*Spears Lawsuit*), No. 21-cv-00074, filed April 2, 2021, in the District Court for the Northern District of Georgia.

In the *Spears Lawsuit*, Mr. Spears sued the IRS and specific revenue agents and individuals associated with what the complaint referred to as a "conservation easement task force." The complaint in the *Spears Lawsuit* alleges that Mr. Spears suffered damages from deciding to provide appraisal services associated with syndicated conservation easements and that the IRS has asserted penalties under section 6695A for appraisals resulting in substantial valuation misstatements.[18]

Significant portions of Mr. Spears's reports were copied and pasted directly from Wikipedia articles. Mr. Spears's reports do not cite Wikipedia or include it in the list of materials relied upon. The Court struck these portions of Mr. Spears's reports.

Throughout his reports, Mr. Spears consistently avoided choosing sales of comparable properties near the properties he was appraising.

---

[18] Section 6695A provides for an assessable penalty imposed against an appraiser for an appraisal resulting in a substantial valuation misstatement on a return—defined as a valuation of property at 150% or more of the correct value. As of the date of his testimony, Mr. Spears had been subject to the section 6695A penalty approximately 20 times for preparing appraisals that were submitted with tax returns for the tax years 2017 and 2018. At trial Mr. Spears could not recall exactly how many times he had been subject to the section 6695A penalty.

**[*19]** He never provided a satisfactory explanation for this repeated, glaring mistake.

The Court does not assign any credibility to the reports produced by Mr. Spears.

### 2.    *Belinda Sward*

Petitioner hired Belinda Sward to prepare a retrospective market analysis report about the Rock Cliff and the JEB Properties. Ms. Sward has a bachelor of business administration marketing degree from Georgia Southern University but has no certification in appraisals or market analysis. She is a member of the Urban Land Institute. We recognized her as an expert and admitted her report for whatever evidentiary value it might have. This Court found Ms. Sward credible regarding her initial reports but does not credit her rebuttal report.

Ms. Sward's initial reports resembled marketing brochures that appeared to be targeted at potential buyers of the Properties. The reports primarily conclude uniformly that homes could be built and sold on the properties, particularly to the "active adult demographic." Ms. Sward does not go so far as to opine on the values of the properties for this purpose; the reports seem to be targeted at establishing the highest and best use (HBU) of the Properties.

Ms. Sward's rebuttal report is aimed at undermining Mr. Sellers's reports concerning the JEB Properties in particular. Nothing in its 13 pages accomplishes that objective. Additionally, Ms. Sward, unlike Mr. Sellers, is not a licensed appraiser, a fact that calls into question her qualifications to rebut Mr. Sellers's report.

### 3.    *Stephen Rakestraw*

Petitioner called on Stephen Rakestraw to offer a rebuttal expert report to Mr. Sellers's appraisal report for the Rock Cliff Property. Mr. Rakestraw has a bachelor's degree and more than 20 years of work experience as a landscape architect. He holds a state license for landscape architecture. We recognized Mr. Rakestraw as an expert in environmental design and land planning and found him credible.

Mr. Rakestraw's rebuttal report offered conclusions on the percentage of the Rock Cliff Property that was suitable for building and septic tank development. Mr. Rakestraw concluded that 69.6% of the Rock Cliff Property would be a "very limited septic area" and produced

[*20] a map identifying the rest of the property as a "somewhat limited septic area."

Mr. Rakestraw also assisted Mr. Spears in preparing Mr. Spears's appraisal reports and was subject to cross-examination regarding such assistance. During cross-examination, it came to light that Mr. Spears had omitted the "cost estimation" sections of the reports that Mr. Rakestraw had provided to Mr. Spears. These sections estimated the costs that would be incurred to facilitate development on the property and were therefore integral to estimating the FMV of the property. The omission of the "cost estimation" sections of Mr. Rakestraw's reports led petitioner to withdraw the portions of Mr. Spears's reports that included Mr. Rakestraw's reports.

### 4. *David Ferrell*

Petitioner called on David Ferrell to offer a rebuttal expert report to Mr. Chamberlain's report about the Rock Cliff Property. Mr. Ferrell has a bachelor's degree in forestry and wildlife management and more than 35 years of work experience as a soil conservationist. We recognized Mr. Ferrell as an expert in agricultural activities and soil conservation and found him credible.

Mr. Ferrell's report primarily concerns the reserved rights for agricultural use on the Rock Cliff Property; he concludes that the rights could not feasibly be exercised because of the soil types and topography of the land. Mr. Ferrell's report concludes that only 12–15 acres of the Rock Cliff Property have any agricultural potential but that those areas would be prohibitively expensive to convert to agriculture. Finally, Mr. Ferrell's report finds that any use of the 12–15 possible acres for agriculture would not be a significant detriment to the overall conservation value of the easement granted on the Rock Cliff Property.[19]

## V. *Tax Return and IRS Examination*

Petitioner timely filed Form 1065 for each PropertyCo for tax year 2015. Each PropertyCo claimed a charitable contribution deduction for a conservation easement and various "other deductions." The IRS selected the PropertyCos' 2015 returns for examination and issued an FPAA to each PropertyCo disallowing many of the claimed deductions.

---

[19] We do not reach the conservation purpose issue at the center of Mr. Ferrell's and Mr. Chamberlain's testimony because we resolve these consolidated cases on other grounds.

[*21] The deductions claimed by the partnerships on their 2015 returns and allowed by the FPAAs are set out *supra* pp. 4–5.

In the FPAAs, the IRS determined that the PropertyCos had not established that they had made noncash charitable contributions or gifts and that the PropertyCos had failed to satisfy the requirements of section 170 for deducting noncash charitable contributions. The IRS also determined that the PropertyCos had failed to establish the values of the noncash charitable contributions and that the PropertyCos had failed to establish the deductibility of the "other deductions."

The IRS asserted 40% accuracy-related penalties under section 6662(h) and alternative 20% penalties under section 6662(a) against the PropertyCos with respect to the charitable contribution deductions; the IRS also asserted 20% accuracy-related penalties under section 6662(a) with respect to the "other deductions."[20]

We have previously found (via Order dated July 10, 2023, granting respondent's Motion for Partial Summary Judgment) that the IRS secured timely supervisory approval for the penalties at issue in these cases. *See* § 6751(b)(1).

OPINION

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year. If the taxpayer makes a gift of property other than money, the amount of the contribution is generally equal to the FMV of the property at the time of the gift. *See* Treas. Reg. § 1.170A-1(c)(1). Deductions generally are not allowed for gifts of property consisting of less than the donor's entire interest in that property, but there is an exception for a "qualified conservation contribution." *See* § 170(f)(3)(A), (B)(iii). This exception applies where (1) the taxpayer makes a contribution of a "qualified real property interest," (2) the donee is a "qualified organization," and (3) the donation is "exclusively for conservation purposes." § 170(h)(1).

Where the claimed value of contributed property exceeds $5,000, no deduction is allowed unless the taxpayer obtains a "qualified

---

[20] With respect to the charitable contributions, the FPAAs also asserted a listed transaction penalty under section 6662A. We will not address the section 6662A penalty because in *Green Valley Investors, LLC v. Commissioner*, 159 T.C. 80, 103 (2022), we held that the imposition of the section 6662A penalty on conservation easement transactions was improper.

[*22] appraisal" of such property. *See* § 170(f)(11)(C). A qualified appraisal is "an appraisal of such property which . . . is conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other guidance prescribed" by the Secretary. *See* § 170(f)(11)(E)(i)(II). When a contribution of property is valued in excess of $500,000, the taxpayer must both obtain and attach to its return "a qualified appraisal of such property." § 170(f)(11)(D). Failure to comply with these requirements generally precludes a deduction. *See* § 170(f)(11)(A)(i) (providing that "no deduction shall be allowed" unless specified substantiation requirements are met).

The noncash charitable contribution deductions in these consolidated cases will be disallowed because the appraisals attached to the returns were not "qualified appraisal[s]." The "other deductions" will also be disallowed.

Additionally, the partnerships are subject to accuracy-related penalties under section 6662(h) and section 6662(a). In order to gauge the magnitude of the partnerships' valuation overstatements, we have to find the value of each of the donated conservation easements.

We consider these issues in turn.

I.      *Burden of Proof*

The Commissioner's determinations in a Notice of Deficiency or an FPAA are generally presumed correct, though the taxpayer can rebut this presumption. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Republic Plaza Props. P'ship v. Commissioner*, 107 T.C. 94, 104 (1996). Deductions are a matter of legislative grace, and taxpayers generally bear the burden of proving their entitlement to the deductions claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).

Section 7491 provides that the burden of proof on a factual issue may shift to the Commissioner if the taxpayer satisfies specified conditions. Among these conditions are that the taxpayer must have "introduce[d] credible evidence with respect to [that] factual issue," § 7491(a)(1), and must have "complied with the requirements under this title to substantiate any item," § 7491(a)(2)(A).

In these cases we do not need to decide which party has the burden of proof because the parties have provided sufficient evidence to enable us to decide all issues by a preponderance of the evidence. *See Estate of Bongard v. Commissioner*, 124 T.C. 95, 111 (2005); *Trout*

[*23] *Ranch, LLC v. Commissioner*, T.C. Memo. 2010-283, 100 T.C.M. (CCH) 581, 583, *aff'd*, 493 F. App'x 944 (10th Cir. 2012). We have discerned no "evidentiary tie" on any relevant factual question. *See Knudsen v. Commissioner*, 131 T.C. 185, 188 (2008) (quoting *Blodgett v. Commissioner*, 394 F.3d 1030, 1039 (8th Cir. 2005), *aff'g* T.C. Memo. 2003-212), supplementing T.C. Memo. 2007-340.

II.    *Qualified Appraiser*

Section 170(f)(11) disallows a deduction for certain noncash charitable contributions unless specified substantiation and documentation requirements are met. In the case of a contribution of property valued in excess of $500,000, the taxpayer must obtain and attach to his return "a qualified appraisal of such property." § 170(f)(11)(D). An appraisal is "qualified" if it is "conducted by a qualified appraiser in accordance with generally accepted appraisal standards" and meets requirements set forth in "regulations or other guidance prescribed by the Secretary." § 170(f)(11)(E)(i). In the case of a partnership, the qualified appraisal requirements "shall be applied at the entity level." § 170(f)(11)(G). Accordingly, we must determine whether the PropertyCos each met these requirements for their contributions of the conservation easements.

To be a "qualified appraiser," an individual must have "earned an appraisal designation from a recognized professional appraiser organization or ha[ve] otherwise met minimum education and experience requirements set forth in regulations prescribed by the Secretary." § 170(f)(11)(E)(ii)(I). The individual must regularly perform "appraisals for which [he] receives compensation" and must meet "such other requirements as may be prescribed by the Secretary." § 170(f)(11)(E)(ii)(II) and (III). The appraiser must also demonstrate "verifiable education and experience in valuing the type of property subject to the appraisal." § 170(f)(11)(E)(iii)(I).

Respondent agrees that Mr. Foster, the appraiser who performed the appraisals attached to the partnerships' returns, met these general requirements in 2015. However, respondent contends that Mr. Foster was not a qualified appraiser by virtue of the exception set forth in Treasury Regulation § 1.170A-13(c)(5)(ii), which provides that an individual is not a qualified appraiser with respect to a particular donation "if the donor had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property." The appraiser

**[\*24]** does *not* become disqualified simply because (1) the appraiser incompetently or carelessly overstated the value, and/or (2) the donor knew that the appraiser overstated the value, and/or (3) the donor knew facts *about the property* that caused the value to be overstated. Rather, this disqualification occurs when the donor knows facts that do or should cause him to expect the appraiser to falsely overstate the value. Such facts will be facts about the appraiser, and the resulting expectation is not just an incorrect overstated value but a "falsely" overstated value.

*Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, at \*42 (construing Treas. Reg. § 1.170A-13(c)(5)(ii)).

Treasury Regulation § 1.170A-13(c)(5)(ii) provides that an appraiser will be disqualified if "the donor and the appraiser make an agreement concerning the amount at which the property will be valued and the donor knows that such amount exceeds the fair market value of the property." This example is silent about the knowledge of the appraiser; it focuses on whether the *donor* actually or constructively knows that the agreed amount exceeds the FMV of the property. *See Dunlap v. Commissioner*, T.C. Memo. 2012-126, 103 T.C.M. (CCH) 1689, 1708 (considering whether the information the donor knew or should have known would cause a reasonable person to believe that the appraiser would falsely overstate the value of an easement).

In gauging a partnership's "knowledge" for this purpose, we look to the knowledge of the person(s) with ultimate authority to manage the partnership. *See, e.g.*, *CNT Invs., LLC v. Commissioner*, 144 T.C. 161, 222 (2015) (examining the knowledge possessed by the general partner in order to assess "good faith"). Mr. Collins was the ultimate manager of the PropertyCos. Therefore, to determine what facts were "known" by the PropertyCos, we must determine what facts were known—actually or constructively—by Mr. Collins.

In 2015 Mr. Collins negotiated the effective purchase of 96% of the Rock Cliff Property for $1.1 million.[21] Mr. Collins testified that the seller, Mr. Baker Jr. was a fair negotiator. All parties were satisfied with the $1.1 million price. The Bakers, local real estate professionals,

---

[21] The parties formally structured this sale as a contribution of the Rock Cliff Property to a partnership (Rock Cliff PropertyCo), and the subsequent sale of partnership interests in that partnership. Respondent did not challenge the form of the transaction.

[*25] had been attempting to sell all 184 acres of the Rock Cliff Property at $1.15 million since approximately 2011 but had been unable to find a buyer. This was not a case of Mr. Collins's getting a bargain price from an unknowledgeable seller; the Bakers took an active role in finding a buyer and proposed the first price in the negotiation.

Nothing in Mr. Collins's testimony indicated that he believed the $1.1 million purchase price for 96% of the Rock Cliff Property was a fantastic deal or anything other than an ordinary, fair price. We conclude that Mr. Collins knew that the entirety of the Rock Cliff Property in 2015 was worth approximately $1.146 million.[22] And despite Mr. Collins's convoluted testimony on the subject, we find that Mr. Collins was well aware that the value of a conservation easement on land cannot be greater than the value of a fee simple interest in the land.[23]

The price in the then-recent sale by the Bakers of the Rock Cliff Property posed an obstacle to Mr. Collins because Mr. Collins's plan was to market a conservation easement transaction involving the Rock Cliff Property to investors. In the conservation easement transactions that Mr. Collins managed, he preferred to keep a ratio of charitable contribution deduction to investor cost of approximately 4.58 to 1.[24] Mr. Collins's preferred ratio offered investors a net benefit of approximately $2 for every $1 of investment depending on their marginal tax rate. Any higher rate of return seemed abusive (or at least risky) to Mr. Collins, and presumably, any lower rate of return would fail to attract investors. If a conservation easement was based solely on the $1.146 million FMV of the Rock Cliff Property, that easement would be able to accommodate a maximum of only $250,000 of investment at the ratios that Mr. Collins preferred to offer. That $250,000 of investment would fail to cover the purchase of the land as well as the transaction costs.

Instead of letting the $1.146 million value of the Rock Cliff Property stop him in his tracks, Mr. Collins reached out to Mr. Foster, an appraiser that he had worked with previously. The two had worked

---

[22] $1.146 million is the $1.1 million purchase price for 96% of the property grossed up to 100%.

[23] Mr. Collins understood the valuation method for a conservation easement (the value of the land before the easement minus the value of the land after the easement) but repeatedly balked on the stand at admitting that the value of a conservation easement could not exceed the value of a fee simple interest in the land.

[24] When marketed to investors, this ratio was exactly 4.4 to 1 in each of the transactions at issue.

[*26] together on a conservation easement transaction in 2014 and cooperated on six such transactions in 2015, including the transactions in these consolidated cases. Both Mr. Collins and Mr. Foster were familiar with the market for conservation easement transactions.

Mr. Foster and Mr. Collins met to discuss the Rock Cliff Property before March 31, 2015. This was before Mr. Foster had completed an appraisal regarding the property and before he had even been engaged to provide such an appraisal. Mr. Collins claims that Mr. Foster provided him with a "verbal estimate" of $14,414,400 during the course of the meeting that occurred before March 31, 2015. This number was reflected in the estimated charitable contribution deductions in the March 31, 2015, Rock Cliff Letter of Intent.

On April 30, 2015, Mr. Collins emailed Mr. Foster to formally engage him to prepare preliminary and final conservation easement appraisals for the Rock Cliff Property. The email provided Mr. Foster with basic information about the Rock Cliff Property, including the acreage, location, and claimed zoning. Mr. Foster produced a preliminary appraisal on June 17, 2015, valuing the easement at $14,812,800 and produced a final appraisal on November 20, 2015, valuing the conservation easement on the Rock Cliff Property at $14,640,000. The final appraisal amount is less than 2% away from the March 31, 2015, value.[25]

Accordingly, we conclude that Mr. Foster and Mr. Collins reached a meeting of the minds that the Rock Cliff Property would be valued at approximately $14.4 million in Mr. Foster's forthcoming appraisals. Our best explanation for the events described above is that the $14.4 million figure was chosen to facilitate a marketable transaction, not to reflect an accurate appraisal of the property.[26]

Petitioner argues that Mr. Foster's "verbal estimate" was the result of appraisal work by Mr. Foster. We disagree. The information in Mr. Collins's April 30 email to Mr. Foster (acreage, location, and claimed zoning) is the sort of information that would be needed to accurately appraise a property, but that email came more than a month

---

[25] The proximity between two such numbers is not in and of itself suspect, but in the context of this case, the closeness of these two numbers contributes to the finding of an impermissible agreement concerning the value of the donated conservation easement.

[26] We see no reasonable reading of the statute which would permit such conduct.

[*27] after the "verbal estimate." Petitioner failed to introduce evidence that Mr. Foster received any of this information before April 30, 2015, other than Mr. Collins's uncorroborated testimony. Any "verbal estimate" Mr. Foster provided without knowing basic information about the property was no estimate at all—it was an attempt to reach a meeting of the minds about what sort of value would be needed to make a conservation easement transaction financially feasible.

Petitioner also asserts that Mr. Collins did not dictate the value to Mr. Foster, contending that such an arrangement is necessary to find that Mr. Foster is not a qualified appraiser. Petitioner's contention is incorrect as a matter of law; disqualifying Mr. Foster as an appraiser does not require a finding that someone told Mr. Foster what value to find. *Oconee Landing Prop., LLC v. Commissioner*, T.C. Memo. 2024-25, at *44 ("An agreement can arise by virtue of acquiescence in a shared goal as well as by response to an explicit instruction." (citing *Ahern v. Cent. Pac. Freight Lines*, 846 F.2d 47, 49 (9th Cir. 1988))), *supplemented by* T.C. Memo. 2024-73.

Mr. Foster's final appraisal of the Rock Cliff Property was written long after Mr. Collins and Mr. Foster agreed on a value of approximately $14.4 million for the conservation easement. Because Mr. Collins knew that the Rock Cliff Property was not worth $14.4 million but rather was worth less than $1.5 million, Mr. Collins "had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property." Treas. Reg. § 1.170A-13(c)(5)(ii). Consequently, Mr. Foster was not a qualified appraiser as to the donation of a conservation easement on the Rock Cliff Property. *See id.*

The events surrounding the appraisals of the JEB Properties also demonstrate that Mr. Collins and Mr. Foster agreed on ultimate appraisal values for the conservation easements long before any real appraisal work was done.

Mr. Collins negotiated the purchase of the JEB Properties with Mr. Baker Jr. Mr. Collins found Mr. Baker Jr. to be a fair negotiator. In the course of these negotiations Mr. Baker Jr. asked for a purchase price of $4,921,800, and the parties ultimately settled on a purchase price of $4,650,000 for the JEB Properties.

Mr. Collins sent an email on April 29, 2015, to a third-party land broker with an estimated value for the JEB Properties of $42,192,000.

**[\*28]** At trial Mr. Collins testified that this value came from Mr. Foster. Puzzlingly, Mr. Foster emailed Mr. Collins two weeks later, on May 13, 2015, requesting the location and address of the JEB Properties.[27] The only information that Mr. Foster had about the properties before May 13, 2015, was the acreages of the properties. Any "informal appraisal" that Mr. Foster discussed with Mr. Collins before learning basic information about the properties was in fact no appraisal at all; it was an agreement to falsely overstate the value of the JEB Properties. And Mr. Collins knew that the JEB Properties' FMV was less than $5 million, having just negotiated the purchase of the JEB Properties.

Considering these facts, and particularly the May 13 email including a $42 million estimate before Mr. Foster had begun a preliminary appraisal of the JEB Properties, we conclude that Mr. Collins and Mr. Foster reached a meeting of the minds that the JEB Properties would be appraised for at least $42 million. Mr. Foster's final appraisals of the JEB Properties indicated a total value of $48.47 million for the land of the JEB Properties. The 15% difference between these two numbers is minute compared to the more than 1,000% difference between true FMV and the $48.47 million valuation. *See infra* Part III, Valuation (finding the FMV of the JEB Properties was reflected in the $4,650,000 purchase price).

Mr. Foster's preliminary and final appraisals of the JEB Properties were written to achieve a value of approximately $42 million for the conservation easement. Because Mr. Collins knew that the JEB Properties were not worth $42–48 million, but rather were worth less than $5 million, Mr. Collins "had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated propert[ies]." Treas. Reg. § 1.170A-13(c)(5)(ii). Accordingly, Mr. Foster was not a qualified appraiser as to the donation of the conservation easements on the JEB Properties. *See id.*

In certain cases, failure to secure a "qualified appraisal" may be excused. Section 170(f)(11)(A)(ii)(II) provides that a charitable contribution deduction will not be disallowed "if it is shown that the failure to [secure a qualified appraisal] is due to reasonable cause and not to willful neglect." *See Belair Woods, LLC v. Commissioner*, T.C. Memo. 2018-159, at \*22. Petitioner does not argue that a reasonable

---

[27] Petitioner clarifies that this email was sent by Mr. Foster's assistant and Mr. Foster "could have [had] information that his assistant did not." Petitioner's reliance on information that Mr. Foster "could have" known is misplaced—they had an opportunity to show what he did know and failed to do so.

**[\*29]** cause defense applies to the PropertyCos' failures to secure qualified appraisals. Any such argument would be immediately foreclosed by Mr. Collins's knowledge of the true FMV of the Rock Cliff Property and the JEB Properties, as well as Mr. Collins's implicit agreement with Mr. Foster to arrive at a predetermined value in order to create a sufficient deduction to make the transaction marketable. *See* Treas. Reg. § 1.6664-4(c)(1)(ii) (providing that, for reliance on professional advice to constitute reasonable cause, "the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true"). No reasonable cause defense applies to the qualified appraisal issue in these consolidated cases.

The final appraisals attached to the PropertyCos' returns were not "qualified appraisals" as required by section 170(f)(11)(E)(i) because Mr. Foster was not a qualified appraiser. Mr. Collins and Mr. Foster "ma[de] an agreement concerning the amount at which the property [would] be valued and [Mr. Collins] kn[ew] that such amount exceed[ed] the fair market value of the [respective] property." Treas. Reg. § 1.170A-13(c)(5)(ii); *see Oconee Landing*, T.C. Memo. 2024-25, at \*45. Accordingly, we will disallow the entirety of the PropertyCos' noncash charitable contribution deductions.[28]

III. *Valuation*

We have held that the PropertyCos are not entitled to noncash charitable contribution deductions for 2015. The proper valuation of the easements is still relevant in determining the penalties that may apply to the partnerships; in particular, the section 6662(h) penalty asserted by respondent applies only if the partnerships reported gross valuation misstatements. *See Oconee Landing*, T.C. Memo. 2024-25, at \*57; *Mill Road*, T.C. Memo. 2023-129, at \*68. A gross valuation misstatement occurs when a taxpayer states the value of donated property to be 200% or more of the correct value. *See* § 6662(e)(1)(A), (h)(2)(A)(i).

---

[28] Respondent raises several other issues with the transactions, including that the properties may have been inventory in the hands of the PropertyCos and that the PropertyCos were not bona fide partnerships until the InvestCo purchases occurred in November 2015. Although on the facts before us we have serious reservations about whether bona fide partnerships existed before the purchases made by the InvestCos in November 2015, in view of our disposition on the qualified appraisals issue, we need not resolve the bona fide partnership issues or the inventory issues and attendant income tax consequences.

**[\*30]** Market prices typically do not exist for conservation easements. *See Symington v. Commissioner*, 87 T.C. 892, 895 (1986). For that reason, courts usually value easements indirectly using a "before and after" approach, seeking to determine the reduction in property value attributable to the easement. *See* Treas. Reg. § 1.170A-14(h)(3)(i); *cf. Browning v. Commissioner*, 109 T.C. 303, 320–24 (1997); *Hughes v. Commissioner*, T.C. Memo. 2009-94, 97 T.C.M. (CCH) 1488, 1490. Using that approach, which we employ below, the value of an easement is equal to the FMV of the real estate before the easement was granted ("before" value), minus the FMV of the real estate as encumbered by the easement ("after" value). *Browning*, 109 T.C. at 320–24.

Treasury Regulation § 1.170A-1(c)(2) defines FMV as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Valuation is not a precise science, and the value of property on a given date is a question of fact to be resolved upon consideration of the entire record. *See Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965).

The best evidence of a property's FMV is the price at which it changed hands in an arm's-length transaction reasonably close in time to the valuation date. *Estate of Newberger v. Commissioner*, T.C. Memo. 2015-246, at \*6 (observing that no evidence is more probative of a donated property's FMV than its direct sale price); *see Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 242–43 (1968), *aff'd per curiam*, 406 F.2d 288 (2d Cir. 1969); *Wortmann v. Commissioner*, T.C. Memo. 2005-227, 90 T.C.M. (CCH) 336, 339–40 (finding that the most persuasive evidence of the property's FMV was the actual sale of the property 17 months before the contribution). If the property did not change hands directly, transactions involving the entity holding the property may provide evidence of the property's value. *See, e.g., TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th 1354, 1368 (11th Cir. 2021); *Seabrook Prop., LLC v. Commissioner*, T.C. Memo. 2025-6, at \*73. The record here includes such evidence for each of the PropertyCos.

Notwithstanding the transactions involving the PropertyCos in the record, the parties presented competing experts who presented reports about the FMV of the properties in 2015. We carefully consider these expert reports even though we ultimately conclude that the expert reports are not the best evidence of the "before" FMV of the properties in these cases. *See Dirico v. Commissioner*, 139 T.C. 396, 416 (2012) ("[I]t is always open to this Court to apply the correct law to the facts

**[\*31]** before it.”); *see also Concord Consumers Hous. Coop. v. Commissioner*, 89 T.C. 105, 126 (1987) (Körner, J. concurring) (“Neither party can avoid the application of the correct law to the facts of the case by failing to plead or argue it.  That is the province of the Court.”).

Experts typically consider one or more of three approaches to determine the property’s FMV: (1) the sales comparison approach, (2) the income approach, and (3) an asset-based approach. *See Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff’d in part, vacated in part, and remanded sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006).

The parties agree on the applicability of the sales comparison approach in these consolidated cases, and the experts from both sides applied that valuation method.  We agree that the sales comparison approach is useful.

The sales comparison approach determines FMV by considering the sale prices realized for similar properties sold in arm’s-length transactions near in time to the valuation date. *See Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979).  Because no two properties are ever identical, the appraiser must make adjustments to account for differences between the comparable properties (e.g., parcel size and location) and terms of the sales (e.g., proximity to valuation date and conditions of sale). *See id.*  The solidity of an appraiser’s valuation “depends to a great extent upon the comparables selected and the reasonableness of the adjustments made.” *Id.* at 19–20.

The sales comparison approach is influenced in part by the HBU of the property because the FMV of real property should reflect its HBU on the valuation date. *See Mitchell v. United States*, 267 U.S. 341, 344–45 (1925); *Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986); Treas. Reg. § 1.170A-14(h)(3)(i) and (ii).  We have defined HBU as “[t]he reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value.” *Whitehouse Hotel Ltd. P’ship v. Commissioner*, 139 T.C. 304, 331 (2012) (quoting Appraisal Institute, *The Appraisal of Real Estate* 277–78 (13th ed. 2008)), *supplementing* 131 T.C. 112 (2008), *aff’d in part, vacated in part, and remanded*, 755 F.3d 236 (5th Cir. 2014).

A property’s HBU is the “most profitable use for which the property is adaptable and needed or likely to be needed in the

**[\*32]** reasonably near future." *Olson v. United States*, 292 U.S. 246, 255 (1934); *see also Symington*, 87 T.C. at 897. If different from the current use, a proposed HBU thus requires both "closeness in time" and "reasonable probability." *Hilborn v. Commissioner*, 85 T.C. 677, 689 (1985). We exclude from consideration any proposed uses that "depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable." *Olson*, 292 U.S. at 257.

We assess an expert's opinion in the light of his or her qualifications and the evidence in the record. *See Parker v. Commissioner*, 86 T.C. 547, 561 (1986). When experts offer competing opinions, we weigh them by examining the factors the experts considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962).

We are not bound by an expert opinion that we find contrary to our judgment. *Parker*, 86 T.C. at 561. We may accept an expert's opinion in toto or accept aspects of his or her testimony that we find reliable. *See Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938); *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 333–40 (2011) (rejecting expert opinion that disregards relevant facts). And we may determine FMV from our own examination of the record. *See Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

A.    *"Before" Value of Rock Cliff Property*

1.    *Highest and Best Use*

Petitioner's valuation expert Mr. Spears determined that the HBU of the Rock Cliff Property was a single-family subdivision with private septic tank systems. He based this decision on the fact that the lack of a sewer system on the property made it impossible for higher density housing to be constructed. Mr. Spears did not analyze any other possible uses of the land, implicitly deciding that rezoning it to commercial was not reasonably probable.

Respondent's valuation expert Mr. Sellers agreed with Mr. Spears about the HBU of the Rock Cliff Property. In reaching this conclusion, Mr. Sellers analyzed the financial feasibility of several alternative uses, including using the property as a "[s]ingle tract for rural residence or recreation/agricultural use," and as a "[r]esidential subdivision with high density." He concluded that the only financially feasible use was a

[*33] "single-family low-density residential subdivision using private septic systems for sewage disposal."

Giving weight to Mr. Sellers's analysis, we find that the HBU of the Rock Cliff Property in November 2015 was a low-density residential subdivision that used private septic systems.

### 2. *Sales Comparison Valuation*

At the time of the conservation easement contribution, the Rock Cliff Property was vacant, unimproved land.

Mr. Sellers performed a sales comparison valuation of the Rock Cliff Property based on an HBU of development into low-density residential housing with septic systems.

Mr. Sellers selected four sales of comparable properties, two involving properties within Walton County, where Rock Cliff is located, and two involving properties in neighboring Jackson County.[29] The sales occurred between February 2014 and February 2017[30] and involved properties ranging in size from 77 to 242 acres. These properties resembled the Rock Cliff Property in their physical characteristics (vacant and no sewer system), zoning, and conditions of sale.

- Comparable #1 was a 115-acre parcel in Jackson County that sold for $4,159 per acre in February 2014.

- Comparable #2 was a 242-acre parcel in Jackson County that sold for $2,300 per acre in December 2014.

- Comparable #3 was a 95-acre parcel in Walton County that sold for $6,562 per acre in June 2014.

---

[29] Jackson County is north of Walton County and had a population of 60,485 in 2010. QuickFacts Jackson County, Georgia, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/jacksoncountygeorgia/POP010210 (last visited Nov. 18, 2024).

[30] Three of the comparable properties were sold in 2014 and one was sold in February 2017. Mr. Sellers did not use the February 2017 sale to determine the value of the Rock Cliff Property but included it "as additional support and demonstration of trends." The property sold in February 2017 is very close to the Rock Cliff Property and similar in all attributes other than having topography superior to that of the Rock Cliff Property.

**[\*34]** • Comparable #4 was a 77-acre parcel in Walton County that sold for $5,412 per acre in February 2017.

For all four transactions, Mr. Sellers analyzed various characteristics of the property sold, including location, topography, access to roads, size, and utilities. On the basis of differences that he noted among the properties, Mr. Sellers classified each property as inferior, superior, or similar to the Rock Cliff Property. He classified Comparable #2 as inferior to Rock Cliff and the other comparables as superior. This established a "bracket" of comparable property sales for the Rock Cliff property between $2,300 per acre and $4,159 per acre. Mr. Sellers ultimately concluded that the FMV of the Rock Cliff Property in November 2015 was $4,000 per acre or $740,000.

Mr. Spears performed a valuation of the Rock Cliff Property for petitioner. Mr. Spears selected six properties as comparables, none involving sales within Walton County or a similar county. Two of the properties were in Fulton County,[31] which is the county that houses downtown Atlanta. The sales occurred between September 2013 and March 2015 and involved properties ranging in size from 54 to 206 acres.

• Comparable #1 was a 91-acre parcel in Forsyth County that sold for $119,688 per acre in July 2014. The parcel had cable, electricity, gas, irrigation, a sewer system, streets, telephone, and water. This property was purchased by Porsche Cars North America, which owns the adjacent lot.

• Comparable #2 was a 113-acre parcel in Forsyth County that sold for $95,388 per acre in December 2013. The parcel had cable, electricity, gas, irrigation, a sewer system, streets, telephone, and water.

• Comparable #3 was a 206-acre parcel in Fulton County that sold for $140,731 per acre in November 2013. The parcel had cable, electricity, gas, irrigation, a sewer system, streets, telephone, and water.

• Comparable #4 was a 72-acre parcel in Fulton County that sold for $210,012 per acre in December 2014. The parcel had cable,

---

[31] The population of Fulton County in the 2010 census was 920,581. QuickFacts Fulton County, Georgia, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/fultoncountygeorgia/POP010210 (last visited Nov. 18, 2024).

**[\*35]** electricity, gas, irrigation, a sewer system, streets, telephone, and water.

- Comparable #5 was a 54-acre parcel in Cobb County[32] that sold for $110,303 per acre in September 2013. The parcel had cable, electricity, gas, irrigation, a sewer system, streets, telephone, and water.

- Comparable #6 was a 58-acre parcel in Forsyth County that sold for $217,232 per acre in March 2015. The parcel was zoned for higher density residential lots than are permissible on the Rock Cliff Property and had public sewer access.

Below is a map of Mr. Spears's chosen "comparable" properties that he included in his expert report.

---

[32] Cobb County had a population of 688,078 at the time of the 2010 census and a population per square mile at that time of 2,026 people. QuickFacts Cobb County, Georgia; Walton County, Georgia, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/cobbcountygeorgia,waltoncountygeorgia/POP010210 (last visited Nov. 18, 2024). Walton County had a population of 83,768 and a population per square mile of 257 that same year. *Id.*

**[*36]**



At trial Mr. Spears acknowledged that Comparables #1 and #5 were not useful.[33] This Court goes one step further: None of the properties chosen by Mr. Spears is a useful comparison to the Rock Cliff Property because of vast locational differences in addition to the presence of a sewer system on each of the properties.

Mr. Spears ultimately concluded that the FMV of the Rock Cliff Property in November 2015 was $100,000 per acre or $18,422,000.

We credit Mr. Sellers's report and testimony. The high end of the FMV ranges that Mr. Sellers determined for the Rock Cliff Property under the "comparable sales" method was $4,152 per acre. This value and the $4,000 per acre that he settled on are roughly consistent with what we believe to be the best evidence of the Rock Cliff Property's

---

[33] Mr. Spears's Comparable #1 is neighbored by Porsche's North America headquarters, and his Comparable #5 contained an existing, finished mobile home park in 2015.

[*37] "before" value, namely, the $1.1 million price ($5,971 per acre) of a 96% interest in the Rock Cliff PropertyCo.

### 3. *Actual Transactions Involving Rock Cliff PropertyCo*

In addition to the value estimates in the expert reports, our finding is informed by the actual transaction involving Rock Cliff PropertyCo. *See, e.g., TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1368; *Seabrook Prop., LLC*, T.C. Memo. 2025-6, at *73 (finding that the value of a company is relevant when determining the value of its real estate assets in a conservation easement context).

In March 2015 Christian MM and Five Rivers agreed on a purchase price of $1.1 million for Christian MM to sell a 96% interest in Rock Cliff PropertyCo after Christian MM's planned contribution of the Rock Cliff Property to Rock Cliff PropertyCo. This price was ultimately paid when the transaction closed in November 2015 and Rock Cliff InvestCo acquired a 96% interest in Rock Cliff PropertyCo for $1.1 million. At the time, Rock Cliff PropertyCo had no significant assets other than the Rock Cliff Property, indicating that the Rock Cliff Property had a total value of approximately $1,145,833.[34]

Christian MM and the Bakers had previously offered the Rock Cliff Property for sale at $1.15 million. Mr. Collins testified that he found Mr. Baker Jr. to be a fair negotiator, and the latter was under no pressure to sell the property, having sufficient assets to stay current on the debt on the property even if the sale did not go through. Mr. Baker III stated that the Bakers were pleased with the $1.1 million sale price of the land. The transaction by which Rock Cliff InvestCo acquired a 96% interest in the Rock Cliff Property was an arm's-length sale between parties with full knowledge of relevant facts.

This transaction occurred very close in time to the valuation dates and the date on which the conservation easement was donated. Christian MM accepted the $1.1 million offer in March 2015. The transaction closed at that price in early November 2015, and the conservation easement was donated on November 13, 2015.

We find that the $1.1 million sale of a 96% interest in the Rock Cliff PropertyCo is the best available evidence as to the "before" value of the Rock Cliff Property on the valuation date. *See, e.g., TOT Prop.*

---

[34] Dividing $1.1 million by 0.96 gives a total value of the Rock Cliff Property of approximately $1,145,833.

[*38] *Holdings, LLC v. Commissioner*, 1 F.4th at 1368; *Seabrook Prop., LLC*, T.C. Memo. 2025-6, at *73. Accordingly, we hold that the "before" FMV of the Rock Cliff Property in November 2015 was $1,145,833.

B. *"Before" Value of Jack's Creek PropertyCo*

1. *Highest and Best Use*

Mr. Sellers agreed with Mr. Spears about the HBU of most of the Jack's Creek Property. For most of the property, large-lot residential development is the only legally permissible use. For a portion of the Jack's Creek Property, Mr. Sellers accurately noted that it is subject to a preexisting conservation easement in favor of the U.S. Army Corps of Engineers and therefore has an HBU of a conserved mitigation area. According to Mr. Sellers's analysis, the preexisting easement on the Jack's Creek Property covers most of the land that had an industrial zoning designation and there is insufficient remaining area with industrial zoning for an industrial zoned building to be constructed. Mr. Sellers concluded that there was a reasonable probability that the portion of the Jack's Creek Property with industrial zoning that was not subject to the conservation easement would be rezoned to residential like the rest of the property.

Mr. Spears determined that the HBU of the Jack's Creek Property was a single-family subdivision. He did not note the preexisting easement on the property covering more than 17 acres and did not mention that part of the property had industrial zoning.[35]

Giving weight to Mr. Sellers's analysis, we find that the HBU of the Jack's Creek Property in November 2015 was a low-density residential subdivision, except for the portion of the property subject to a preexisting easement.

2. *Sales Comparison Valuation*

At the time of the conservation easement contribution, the Jack's Creek Property was vacant, unimproved land.

---

[35] Mr. Spears's report appraises only 110.7 acres and omits the 17.79 acres covered by the preexisting easement.

**[*39]** Mr. Sellers performed a comparable property sales comparison valuation of the Jack's Creek Property based on an HBU of development into low-density residential housing.

Mr. Sellers selected five properties as comparables, three within Walton County, where the Jack's Creek Property is located, and two in neighboring Jackson County.[36] Sales occurred between July 2014 and December 2017, and the properties ranged in size from 48 to 226 acres. These properties resembled the Jack's Creek Property in their physical characteristics (vacant and no sewer system), zoning, and conditions of sale.

- Comparable #1 was a 53-acre parcel in Jackson County that sold for $7,460 per acre in July 2014.

- Comparable #2 was a 95-acre parcel in Walton County that sold for $6,562 per acre in June 2014.

- Comparable #3 was an 89-acre parcel in Jackson County that sold for $7,697 per acre in April 2015.

- Comparable #4 was a 226-acre parcel in Walton County that sold for $7,247 per acre in November 2016.

- Comparable #5 was a 48-acre parcel in Walton County that sold for $9,896 per acre in December 2017.

For all five sales, Mr. Sellers analyzed various characteristics of the property sold, including location, topography, access to roads, size, and utilities. On the basis of the differences among the properties, Mr. Sellers classified each property as inferior, superior, or similar to the Jack's Creek Property. He classified Comparables #1, #2, #3, and #4 as inferior to the Jack's Creek Property and Comparable #5 as superior. This established a lower bound of comparable property sales for the Jack's Creek Property of $7,247 per acre, with the 2017 sale of Comparable #5 providing a post hoc approximation of an upper bound at $9,896 per acre.

---

[36] Mr. Sellers also selected three comparable property sales specifically for the portion of Jack's Creek that was subject to a pre-existing easement. We do not address these sales because the "before" and "after" values of that section of the Jack's Creek Property are the same. These sales indicate a value of approximately $800 per acre for land subject to a conservation easement.

[*40] Mr. Sellers ultimately concluded that the FMV of the Jack's Creek Property in November 2015 was $905,000; $8,000 per acre for the residential portion and $800 per acre for the portion subject to a preexisting conservation easement.

Mr. Spears performed a separate valuation of the property for petitioner. Mr. Spears selected the same six comparables for the Jack's Creek Property that he had selected for the Rock Cliff Property. These sales are a slightly better fit here because the Jack's Creek Property has access to public sewer, but none of Mr. Spears' chosen comparables was within Walton County or a similar county. On the basis of his chosen comparables, Mr. Spears concluded that the Jack's Creek Property had a "before" value of $130,000 per acre or $14,391,000. Mr. Spears excluded the portion of the property that was already subject to a conservation easement from this valuation.

We credit Mr. Sellers's report and testimony. The low end of the FMV ranges that Mr. Sellers determined for the Jack's Creek Property under the "comparable sales" method was $7,247 per acre. This value and the $8,000 per-acre value that he settled on are in the same ballpark as what we believe to be the best evidence of the parcel's "before" value, namely, the $1,991,225 price of a 98% interest in Jack's Creek PropertyCo.

3. <em>Actual Transaction Involving Jack's Creek PropertyCo</em>

On August 24, 2015, George W. Baker Jr. LLC agreed on a purchase price of $1,991,225 to sell a 98% interest in Jack's Creek PropertyCo to Jack's Creek InvestCo.[37] This price was ultimately paid when the transaction closed in November 2015 and George W. Baker Jr. LLC received $1,991,225 or approximately $15,028 per acre. Because Jack's Creek PropertyCo held no other significant assets, the sale price indicates the value of 100% of the Jack's Creek Property is $2,031,862.[38]

As noted above, Mr. Collins testified that he found Mr. Baker Jr. to be a fair negotiator, and the latter was under no pressure to sell the property. Mr. Baker III stated that he was pleased with the sale price of the land. Accordingly, we find that the transaction by which Jack's

---

[37] The transactions leave George W. Baker Jr. LLC with a 1% interest, Five Rivers with a 1% interest, and Jack's Creek InvestCo with a 98% interest.

[38] Dividing the $1,991,225 purchase price by 0.98 gives $2,031,862 as the total value of the Jack's Creek Property.

**[\*41]** Creek InvestCo acquired a 98% interest in the Jack's Creek PropertyCo was an arm's-length sale between parties with full knowledge of relevant facts.

This transaction occurred very close in time to the valuation dates. George W. Baker Jr. LLC accepted the $1,991,225 offer in August 2015. The transaction closed at that price in early November 2015, and the conservation easement was donated on November 13, 2015.

We find that the sale of a 98% interest in the Jack's Creek PropertyCo is the best available evidence as to the "before" value of the Jack's Creek Property on the valuation dates. *See, e.g., TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1368; *Seabrook Prop., LLC*, T.C. Memo. 2025-6, at \*73. Therefore, the "before" FMV of the Jack's Creek Property in November 2015 was $2,031,862.

C.     *"Before" Value of East Village PropertyCo*

1.     *Highest and Best Use*

Mr. Spears determined that the HBU of the East Village Property was a single-family residential subdivision for the entirety of the property. Mr. Spears concluded that there was strong current and future demand for single-family residential property in Walton County. Mr. Spears analyzed the value of only part of the property—ignoring the 11.4 acres already subject to a preexisting conservation easement.

Mr. Sellers concluded that the HBU for most of the East Village Property was a large-lot residential subdivision in three to five years depending on the market conditions. Mr. Sellers asserted that the stagnant population growth in Walton County would have made immediate development of the East Village Property not financially feasible, but such development would be profitable in the future.

Finding the experts in agreement, we find that the highest and best use of the East Village Property in November 2015 was to be developed as a low-density residential subdivision in the near future[39] except for the portion of the land already subject to a conservation easement.

---

[39] The market conditions (lack of financial feasibility of immediate development in 2015) may affect the value of this property and comparable property sales but does not alter the HBU here.

**[\*42]**      2.     *Sales Comparison Valuation*

At the time of the conservation easement contribution, the East Village Property was vacant, unimproved land.

Mr. Sellers performed a sales comparison valuation of the East Village Property based on an HBU of development into low-density residential housing for the portion not subject to a preexisting conservation easement.

Mr. Sellers selected sales of five comparable properties as comparable sales for the residential portion of the East Village Property. Three of these sales involved properties within Walton County, where the East Village Property is located, and two involved properties in neighboring Jackson County. The sales occurred between June 2014 and December 2017 and involved properties ranging in size from 48 to 226 acres. The East Village Property had a residential area of approximately 43 acres. These properties resembled the East Village Property in their physical characteristics (vacant), zoning, and conditions of sale.

- Comparable #1 was a 53-acre parcel in Jackson County that sold for $7,460 per acre in July 2014.

- Comparable #2 was a 95-acre parcel in Walton County that sold for $6,562 per acre in June 2014.

- Comparable #3 was an 89-acre parcel in Jackson County that sold for $7,697 per acre in April 2015.

- Comparable #4 was a 226-acre parcel in Walton County that sold for $7,247 per acre in November 2016. This property is located within 1,500 feet of the East Village Property.

- Comparable #5 was a 48-acre parcel in Walton County that sold for $9,896 per acre in December 2017. This property is adjacent to the parent tract of the East Village Property.

For all five transactions, Mr. Sellers analyzed various characteristics of the property sold, including location, topography, access to roads, size, and utilities. On the basis of differences he noted between the properties, Mr. Sellers classified each property as inferior, superior, or similar to the East Village Property. He classified Comparables #1, #2, and #3 as inferior to the East Village Property

[*43] mostly because of location differences. He did not rely on Comparables #4 and #5 for his primary conclusion but classified #4 as inferior to the East Village Property and #5 as superior. This established a "bracket" of comparable property sales for the East Village Property between $7,697 per acre and $9,895 per acre. Mr. Sellers ultimately concluded that the "before" FMV of the 43.47-acre residential portion of the East Village Property in November 2015 was $8,000 per acre or $350,000. Mr. Sellers assigned a value of $10,000 (approximately $870 per acre) to the section of the East Village Property already subject to a conservation easement.

Mr. Spears performed a separate valuation of the property for petitioner. Mr. Spears selected six properties as comparables, none involving sales within Walton County or a similar county. Two of the properties were in Fulton County, which is the county that houses downtown Atlanta. The sales occurred between December 2012 and August 2015 and involved properties ranging in size from 33 to 58 acres. The residential portion of the East Village Property is 43 acres. Mr. Spears did not address the other 11 acres of the East Village Property that are subject to a preexisting conservation easement.

- Comparable #1 was a 52-acre parcel in Fulton County that sold for $286,830 per acre in August 2015.

- Comparable #2 was a 58-acre parcel in Forsyth County that sold for $217,232 per acre in March 2015.

- Comparable #3 was a 48-acre parcel in Cobb County that sold for $168,284 per acre in September 2014.

- Comparable #4 was a 33-acre parcel in Cobb County that sold for $363,636 per acre in December 2012.

- Comparable #5 was a 45-acre parcel in Cobb County that sold for $240,174 per acre in December 2012.

- Comparable #6 was a 57-acre parcel in Fulton County that sold for $159,556 per acre in June 2014.

On the basis of his chosen comparables, Mr. Spears concluded that the residential portion of the East Village Property had a "before" value of $250,000 per acre or $10,875,000 in November 2015. To arrive at this value, Mr. Spears averaged the prices of his chosen comparables and applied unexplained adjustments between 4% and 9%—implicitly

**[\*44]** equating property in Walton County with property in the same county as metro Atlanta. Mr. Spears does not address any comparables with more similar locations or otherwise explain the vast gulf between the values of the properties he selected and the values of comparable properties sold within Walton County.

We credit Mr. Sellers's report and testimony. The high end of the FMV ranges that Mr. Sellers determined for the East Village Property under the "comparable sales" method was $9,895 per acre. This value and the $8,000 per acre that he settled on are roughly consistent[40] with what we believe to be the best evidence of the parcels' "before" value, namely, the $875,373 price (approximately $16,000 per acre) of a 98% interest in the East Village PropertyCo.

3.   *Actual Transactions Involving East Village PropertyCo*

In August 2015[41] the East Village Landowners (Henry Phillip Richardson, James Donald Richardson, Monroe Walton, and Baker Walton), Five Rivers, and East Village InvestCo agreed on a purchase price of $875,373 for a 98% interest in East Village PropertyCo. This price was ultimately paid when the transaction closed in November 2015 and East Village InvestCo acquired a 98% interest in East Village PropertyCo for $875,373. The East Village PropertyCo held no other significant assets at the time, indicating that the total value of the East Village Property was around $893,238.[42]

The transaction by which East Village InvestCo acquired a 98% interest in the East Village PropertyCo was an arm's-length sale between parties with full knowledge of relevant facts. The same parties negotiated this sale and the other sales that we have already found to be arm's-length transactions.

This transaction occurred very close in time to the valuation date. the East Village Landowners accepted the $875,373 offer in August 2015. The transaction closed at that price in early November 2015, and the conservation easement was donated on November 13, 2015.

---

[40] In stark contrast to the $250,000 per-acre price suggested by Mr. Spears.

[41] The East Village Letter of Intent is not dated by the sellers—the last parties to sign it.

[42] Dividing the $875,373 purchase price by 0.98 gives a total value of the East Village Property of $893,238.

**[\*45]** We find that the sale of a 98% interest in the East Village PropertyCo is the best available evidence as to the "before" value of the East Village Property on the valuation date. *See, e.g.*, *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1368; *Seabrook Prop., LLC*, T.C. Memo. 2025-6, at \*73. Therefore, the "before" FMV of the East Village Property in November 2015 was $893,238.

### D.      *"Before" Value of Baker's Farm PropertyCo*

#### 1.      *Highest and Best Use*

Mr. Spears determined that the HBU of the Baker's Farm Property was 18 acres of commercial development and approximately 46 acres of single-family residential subdivision. Mr. Spears's report appears to claim that 18 acres of the property already had commercial zoning.

Mr. Sellers agreed with Mr. Spears that the HBU of the Baker's Farm Property was split between commercial and residential use. Mr. Sellers opined that it was reasonably likely for 10 acres of the property to be rezoned to permit commercial development. Mr. Sellers identified those 10 acres in his report and was well reasoned in his analysis of the probability of a zoning change. For the other ~55 acres of the property, Mr. Sellers concluded that the HBU was for the property to be held for three to five years and then developed into a low-density residential subdivision.

Giving weight to Mr. Sellers's analysis, we find that the HBU of the Baker's Farm Property in November 2015 was split between 10 acres of commercial use and 55 acres of low-density residential use.

#### 2.      *Sales Comparison Valuation*

At the time of the conservation easement contribution, the Baker's Farm Property was vacant, unimproved land.

Mr. Sellers performed a sales comparison valuation of the Baker's Farm Property based on a split HBU between commercial and low-density residential housing development.

Mr. Sellers selected seven comparables, two involving commercial properties and five involving residential properties. Both commercial properties and three of the residential properties were in Walton County, where the Baker's Farm Property is located, and the other two

[*46] residential properties were in nearby Jackson County. The sales occurred between June 2010 and December 2017 and involved properties ranging in size from 4 to 226 acres. The sales that took place after November 2015 were not used for the primary conclusion but were included as additional support because those properties are very near the properties involved in these cases. Each of these properties resembled the Baker's Farm Property in its physical characteristics (vacant), zoning, and conditions of sale.

- Comparable #1 was a residential 53-acre parcel in Jackson County that sold for $7,460 per acre in July 2014.

- Comparable #2 was a residential 95-acre parcel in Walton County that sold for $6,562 per acre in June 2014.

- Comparable #3 was a residential 89-acre parcel in Jackson County that sold for $7,697 per acre in April 2015.

- Comparable #4 was a residential 226-acre parcel in Walton County that sold for $7,247 per acre in November 2016.

- Comparable #5 was a residential 48-acre parcel in Walton County that sold for $9,896 per acre in December 2017.

- Comparable #6 was a commercial 4-acre parcel in Walton County that sold for $107,056 per acre in February 2012.

- Comparable #7 was a commercial 4-acre parcel in Walton County that sold for $110,000 per acre in June 2010.

For all seven transactions, Mr. Sellers analyzed various characteristics of the property sold, including location, topography, access to roads, size, and utilities. On the basis of differences that he noted between the properties, Mr. Sellers classified each property as inferior, superior, or similar to the Baker's Farm Property. He classified Comparables #1, #2, #3, and #4 as inferior to the Baker's Farm Property and Comparable #5 as superior. This established a lower bound for the price of the residential portion of the Baker's Farm Property at $7,697 per acre. Mr. Sellers ultimately concluded that the FMV of the 55-acre residential portion of the Baker's Farm Property in November 2015 was $9,000 per acre or $490,000. The 2017 sale of Comparable #5 for $9,896 per acre provides confirmation that Mr. Spears's conclusion is reasonably accurate.

[*47] Mr. Sellers classified the two commercial properties as similar to the Baker's Farm Property; both properties shared the same parent tract as the Baker's Farm Property. Reasoning that the commercial real estate market had not gotten stronger since 2010 and 2012, Mr. Sellers concluded that the ten-acre commercial portion of the Baker's Farm Property had an FMV in November 2015 of $110,000 per acre or $1.1 million.

Mr. Spears performed a separate valuation of the Baker's Farm Property for petitioner. Mr. Spears's report is riddled with errors and omissions. It never substantiates its claim that 18 acres of the property have commercial zoning and never even identifies which 18 acres Mr. Spears is referring to when he makes that claim. This Court finds it most likely that Mr. Spears mistakenly considered two 4-acre lots that are not part of the Baker's Farm Property when arriving at his 18-acre number for the total commercially zoned property.

Mr. Spears's report also includes numerous photos of frontage along U.S. Highway 78 and Southview Drive. The Baker's Farm Property has no frontage along either of those roads. Similar errors repeat for at least eight photos in Mr. Spears's Baker's Farm Property report.

Mr. Spears selected ten properties as comparables, none involving sales within Walton County or a similar county. Four of the properties were located in Fulton County, which is the county that houses downtown Atlanta. The sales occurred between September 2013 and August 2015 and involved properties ranging in size from 7 acres to 58 acres.

- Comparable #1 was a residential 52-acre parcel in Fulton County that sold for $286,830 per acre in August 2015.[43]

- Comparable #2 was a residential 58-acre parcel in Forsyth County that sold for $217,232 per acre in March 2015.

- Comparable #3 was a residential 48-acre parcel in Cobb County that sold for $168,284 per acre in September 2014.

---

[43] This property had an agricultural zoning at the time of sale but was apparently purchased for residential development.

**[\*48]** • Comparable #4 was a residential 32-acre parcel in Cobb County that sold for $374,754 per acre in December 2012.

- Comparable #5 was a residential 45-acre parcel in Cobb County that sold for $240,174 per acre in December 2012.

- Comparable #6 was a residential 57-acre parcel in Fulton County that sold for $160,510 per acre in June 2014.

- Comparable #7 was a commercial 7-acre parcel in Fulton County that sold for $400,000 per acre in December 2014. This lot is adjacent to the Hartsfield-Jackson Atlanta International Airport and was purchased by Porsche Cars North America, which owns the neighboring lot.

- Comparable #8 was a commercial 11-acre parcel in Fulton County that sold for $236,051 per acre in April 2015.

- Comparable #9 was a commercial 10-acre parcel in Gwinnett County that sold for $220,588 per acre in October 2014.

- Comparable #10 was a commercial 10-acre parcel in Gwinnett County that sold for $245,965 per acre in October 2013.

For the residential comparable sales, Mr. Spears included this statement: "The six (6) comparable sales have slightly superior locations in fully developed areas of Metro Atlanta. The comparable land sales are located from 30 to 60 miles from the subject. I have estimated an adjustment of -10% for a superior location." This same 10% location adjustment recurs throughout Mr. Spears's analysis but is never justified or explained in any depth.

Mr. Spears never explains why he chose a total of zero comparables from Walton County in any of his four appraisals of property located in Walton County. Mr. Spears's final valuation analysis of the commercial property sales comparisons consists of three sentences stating that that the "subject *residential* land" has an FMV of $250,000 per acre. This analysis does not explain why the land in Walton County would have a $250,000 per-acre value when only one of the four comparables that he selected in better locations had a value above $245,000 per acre.

**[*49]** On the basis of his chosen comparables, Mr. Spears concluded that the 45-acre[44] residential portion of the Baker's Farm Property had a "before" value of $250,000 per acre or $11,475,000 in November 2015. He also concluded that the "18-acre" commercial portion of the Baker's Farm Property had an FMV of $250,000 per acre or $4,625,000. This brings Mr. Spears's total "before" FMV estimate for the Baker's Farm Property in November 2015 to $16,100,000.

We credit Mr. Sellers's report and testimony. The FMV that Mr. Sellers determined for the Baker's Farm Property under the "comparable sales" method was $1,590,000. This is consistent with what we believe to be the best evidence of the parcels' "before" value, namely, the $1,819,797 value derived from the purchase price that the Baker's Farm InvestCo paid for 98% of Baker's Farm PropertyCo.

### 3. *Actual Transactions Involving Baker's Farm PropertyCo*

In August 2015[45] Baker Walton and Monroe Walton agreed to sell 98% of the Baker's Farm PropertyCo to Baker's Farm InvestCo for a purchase price of $1,783,402 in a letter of intent. This price was ultimately paid when the transaction closed in November 2015 and Baker's Farm InvestCo acquired a 98% interest in Baker's Farm PropertyCo for $1,783,402. Because Baker's Farm PropertyCo held no other significant assets, this indicates a total value of the Baker's Farm Property of $1,819,798.[46]

For the same reasons stated above in our consideration of similar transactions, the transaction by which Baker's Farm InvestCo acquired a 98% interest in the Baker's Farm PropertyCo was an arm's-length sale between parties with full knowledge of relevant facts. The same parties negotiated this sale and the other sales that we have already found to be arm's-length transactions.

This transaction occurred very close in time to the valuation date. Baker Walton and Monroe Walton accepted the offer in August 2015.

---

[44] According to Mr. Spears, 18 acres of the Baker's Farm Property are zoned as commercial and approximately 45 acres are zoned as residential.

[45] The Baker's Farm Letter of Intent is not dated by the sellers—the last parties to sign it.

[46] Dividing the $1,783,402 by 0.98 gives a total value of the Baker's Farm Property of $1,819,797.

**[\*50]** The transaction closed at that price in early November 2015, and the conservation easement was donated on November 13, 2015.

We find that the sale of a 98% interest in the Baker's Farm PropertyCo is the best available evidence as to the "before" value of the Baker's Farm Property on the valuation dates. *See, e.g., TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1368; *Seabrook Prop., LLC*, T.C. Memo. 2025-6, at \*73. Accordingly, we hold that the "before" FMV of the Baker's Farm Property in November 2015 was $1,819,798.

E.      *"After" Values and Conservation Easement Values*

The "after" value determined by each party's experts for each property are as follows:

| Property | Petitioner (Mr. Spears) | Respondent (Mr. Sellers) |
|---|---|---|
| Rock Cliff | $368,000 | $185,000 |
| Jack's Creek | 166,000 | 125,000 |
| East Village | 62,250 | 55,000 |
| Baker's Farm | 96,600 | 65,000 |

Because the "after" values determined by respondent's expert, Mr. Sellers, are lower than (and thus advantageous to the partnerships) the "after values" determined by petitioner's experts, we will deem respondent to have conceded the "after" values of the Properties.

Accordingly, the values of the conservation easements are as follows:

| Property | Before Value | After Value | Conservation Easement Value[47] |
|---|---|---|---|
| Rock Cliff | $1,145,833 | $185,000 | $960,833 |
| Jack's Creek | 2,031,862 | 125,000 | 1,906,862 |
| East Village | 893,238 | 55,000 | 838,238 |
| Baker's Farm | 1,819,798 | 65,000 | 1,754,798 |

---

[47] Difference between the values of the properties "before" and "after" the conservation easements were donated. *See* Treas. Reg. § 1.170A-14(h)(3)(i); *see also Browning*, 109 T.C. at 320–24; *Hughes*, 97 T.C.M. (CCH) at 1490.

[*51] IV.   *Other Deductions*

In addition to adjusting the partnerships' noncash charitable contribution deductions, the IRS adjusted the "other deductions" claimed by the partnerships as follows:

| Partnership | Total "Other Deductions" Claimed | Total "Other Deductions" Allowed by the FPAA |
|---|---|---|
| Rock Cliff | $2,046,255 | $16,594 |
| Jack's Creek | 2,103,623 | 16,427 |
| East Village | 1,515,713 | 7,641 |
| Baker's Farm | 998,598 | 16,208 |

Petitioner does not identify any deductible expenses associated with the "other deductions"; instead petitioner argues that "these expenses were appropriately characterized as other deductions for each investor to make the determination." Petitioner's argument misses the mark.

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. at 84. Petitioner's attempt to describe the expenses as "appropriately characterized" does not prove the partnerships' entitlement to deductions for the expenses at issue. Because petitioner fails to offer any argument that the "other deductions" shown on the returns are deductible, we uphold respondent's adjustments to "other deductions" as shown on the FPAAs. *See J L Minerals, LLC v. Commissioner*, T.C. Memo. 2024-93, at *65.

V.   *Section 6662 Accuracy-Related Penalties*

Respondent determined accuracy-related penalties under section 6662 with respect to both the noncash charitable contribution deductions and the other deductions claimed by the PropertyCos.

Section 6662(a) and (b)(1), (2), and (3) imposes an accuracy-related penalty on an "underpayment of tax required to be shown on a return . . . equal to 20 percent of the portion of the underpayment to which this section applies" upon a taxpayer who underpays its tax because of, among other things, "[n]egligence or disregard of rules or regulations," a "substantial understatement of income tax," or a

[*52] "substantial valuation misstatement." An understatement of income tax is substantial if it exceeds the greater of "10 percent of the tax required to be shown on the return for the taxable year" or $5,000. § 6662(d)(1)(A). For the year at issue, a substantial valuation misstatement exists if "the value of any property . . . claimed on any return . . . is 150 percent or more of the amount determined to be the correct amount of such valuation." § 6662(e)(1)(A). None of these penalties will be imposed where the taxpayer had "reasonable cause." § 6664(c)(1). *But see* § 6664(c)(3) (imposing heightened requirements for a substantial valuation overstatement).

One possible ground for claiming "reasonable cause" is reliance on professional advice. *See* Treas. Reg. § 1.6664-4(b). "If a taxpayer alleges reliance on the advice of a tax professional, that 'advice must generally be from a competent and independent advisor unburdened with a conflict of interest and not from promoters of the investment.'" *Oakhill Woods, LLC v. Commissioner*, T.C. Memo. 2020-24, at *29 (quoting *Mortensen v. Commissioner*, 440 F.3d 375, 387 (6th Cir. 2006), *aff'g* T.C. Memo. 2004-279); *see also Gustashaw v. Commissioner*, 696 F.3d 1124, 1139 (11th Cir. 2012), *aff'g* T.C. Memo. 2011-195. "Advice hardly qualifies as disinterested or objective if it comes from parties who actively promote or implement the transactions in question." *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1382 (Fed. Cir. 2010). "A taxpayer advancing a reliance-on-professional-advice defense must also show that it actually relied in good faith on the advice it received." *Oakhill Woods*, T.C. Memo. 2020-24, at *29; *see also Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98–99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

In the case of a "gross valuation misstatement"—i.e., where the value of property claimed on the return is 200% or more of the amount determined to be the correct valuation—the rate of the accuracy-related penalty is increased to 40%, § 6662(h)(1) and (2)(A)(i), and no "reasonable cause" defense is available, § 6664(c)(3).[48]

---

[48] Generally, only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is penalizable on more than one of the grounds set forth in section 6662(b). This "no-stacking" rule applies only at the partner level; "[t]here is . . . no limitation on our ability to determine *the applicability* of more than one accuracy-related penalty at the partnership level." *Oconee Landing*, T.C. Memo. 2024-73, at *3; *see also Mill Road*, T.C. Memo. 2023-129, at *70.

[*53]  A.     *40% Penalty for Gross Valuation Misstatements*

The PropertyCos claimed noncash charitable contribution deductions for conservation easements that we found to have the following values:

| Partnership | Actual Conservation Easement Value | Claimed Conservation Easement Value | Magnitude of Valuation Misstatement |
|---|---|---|---|
| Rock Cliff | $960,833 | $14,640,000 | 1,523% |
| Jack's Creek | 1,906,862 | 19,000,000 | 996% |
| East Village | 838,238 | 16,000,000 | 1,908% |
| Baker's Farm | 1,754,798 | 13,000,000 | 740% |

The PropertyCos each overstated on their returns the values of the easements by much more than 200% with the "lowest" misstatement being 740% of the correct value. The 40% penalty under section 6662(h) for a gross valuation misstatement applies, and no reasonable cause defense is available. *See* § 6662(e)(1)(A), (h)(2)(A)(i). Specifically, the 40% penalty applies to the portions of the PropertyCos' underpayments attributable to claiming values of the easements in excess of the actual values shown above. *See Mill Road*, T.C. Memo. 2023-129, at *68.

B.     *20% Penalty as to Substantial Understatements*

The FPAAs asserted accuracy-related penalties with respect to the partnerships' deductions that were based on substantial understatements of income tax and negligence. *See* § 6662(a) and (b)(1) and (2). As to a substantial understatement, any understatement of income tax attributable to the disallowance of other deductions that "exceeds the greater of—(i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $5,000," § 6662(d)(1)(A), is subject to penalty at the 20% rate.

We hold in the alternative, and to the extent that the understatement for any partner is so small that it does not count as "substantial," that the underpayments are attributable to negligence. "Negligence has been defined as lack of due care or failure to do what a reasonably prudent person would do under like circumstances." *Mill Road*, T.C. Memo. 2023-129, at *70 (citing *Ocmulgee Fields, Inc. v. Commissioner*, 132 T.C. 105, 123 (2009), *aff'd*, 613 F.3d 1360 (11th Cir. 2010)). It "includes any failure to make a reasonable attempt to comply

**[\*54]** with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return." Treas. Reg. § 1.6662-3(b)(1). Negligence also "includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly." *Id.* As we have explained, petitioner has failed to identify proper grounds for the partnerships' "other deductions."

Petitioner urges a reasonable cause defense to the 20% penalty that applies to the "other deductions" and to the portions of the noncash charitable contribution deductions not subject to the 40% gross valuation misstatement penalty. Petitioner offered no plausible evidence to show that any of the parties involved had reason to believe they were entitled to the "other deductions" claimed on their returns or that they "exercised ordinary business care and prudence" in taking those tax positions. *See Crimi v. Commissioner*, T.C. Memo. 2013-51, at \*99. And we have already determined that the partnerships lacked reasonable cause for failure to secure a qualified appraisal. *See supra* pp. 28–29.

When the reasonable cause defense relies on a partnership's actions, the partnership is bound by the knowledge of the person with ultimate authority to manage the partnership. *See, e.g., CNT Invs., LLC*, 144 T.C. at 222; *Superior Trading, LLC v. Commissioner*, 137 T.C. 70, 91–92 (2011), *supplemented by* T.C. Memo. 2012-110, *aff'd*, 728 F.3d 676 (7th Cir. 2013). Mr. Collins was the manager of each PropertyCo; therefore, his knowledge and state of mind will control the applicability of the reasonable cause defense at the partnership level.

Petitioner did not introduce facts that show ordinary business care or prudence on the part of Mr. Collins; instead, Mr. Collins testified that he did not receive any formal tax opinions about the transactions because "tax opinions really weren't worth the paper they were written on."[49] Additionally, petitioner's certified public accountant, Randy Bowen, testified about the "other deductions," saying that his opinion in 2015 was that "they're not deductible." Petitioner has failed to meet its burden of establishing for the partnerships a reasonable cause defense

---

[49] The relevant trial testimony during cross-examination:

Question: So for these four transactions at issue, did you receive any formal tax opinions?
Answer: I did not.
Question: Why not?
Answer: I have been told that tax opinions really weren't worth the paper they were written on.

**[\*55]** to the 20% accuracy-related penalties. *See* Rule 142(a); *Fischer v. Commissioner*, 50 T.C. 164, 177 (1968).

VI.   *Conclusion*

The partnerships' noncash charitable contribution deductions are disallowed in full because the attached appraisals were not "qualified appraisals." Additionally, the partnerships are not entitled to any "other deductions" in excess of those allowed in the FPAA.

The gross valuation misstatement penalty under section 6662(a) and (h) applies to the noncash charitable contribution deductions claimed in excess of the actual values of the conservation easements, and the substantial understatement of income tax or negligence penalty under section 6662(a) and (b)(1) and (2) applies to the remainder of the charitable contribution deductions as well as to the "other deductions."

We have considered all of the parties' contentions and arguments. To the extent not discussed above, we find them unnecessary to reach, without merit, or irrelevant.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*